RECORD NO. 14-1503

IN THE

# United States Court of Appeals

## FOR THE FOURTH CIRCUIT

### RICHARD W. MANN,

*Plaintiff-Appellant,*

v.

### EUROPEAN AMERICAN INVESTMENT BANK AG,

*Defendant-Appellee.*

---

### OPENING BRIEF OF PLAINTIFF-APPELLANT

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF NORTH CAROLINA AT GREENSBORO**

Raymond A. Knight
ATTORNEY AT LAW
3124 Allerton Lake Drive
Winston-Salem, North Carolina 27106
(336) 546-7067 (Telephone)
rayaknight@aol.com

Counsel for Plaintiff-Appellant

---

## UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
### DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No. __14-1503__    Caption: __Richard W. Mann v. European American Investment Bank AG__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Richard W. Mann__
(name of party/amicus)

_____

who is _____Appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO

2.    Does party/amicus have any parent corporations?    ☐YES ☑NO
      If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐YES ☑NO
      If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?    ☐ YES ☑ NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐ YES ☑ NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?    ☐ YES ☑ NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: /s/Raymond A. Knight                          Date:    May 30, 2014

Counsel for: Appellant

## CERTIFICATE OF SERVICE
*****************************

I certify that on    May 30, 2014    the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

Timothy G. Barber
tbarber@kslaw.com
KING & SPAULDING LLP
100 North Tryon Street
Suite 3900
Charlotte, North Carolina 28202
Telephone:  704-503-2600
Fax:        704-503-2622
Attorneys for Appellee

/s/Raymond A. Knight                                     May 30, 2014
_____                                  _____
(signature)                                              (date)

- 2 -

# TABLE OF CONTENTS

                                                                    **Page**

TABLE OF AUTHORITIES……………………………………………     iv

I.   STATEMENT OF SUBJECT MATTER AND APPELLATE
     JURISDICTION …………………………….............................     1

II.  STATEMENT OF ISSUES.....................................................     1

III. STATEMENT OF THE CASE AND FACTS......................................     2

IV.  SUMMARY OF ARGUMENT…………………………………..     4

V.   ARGUMENT…………………………………………………..     7

     A.  IRS Enforcement Authority Has Statutory Basis………….........     7

     B.  IRS Findings Show That Defendant's Agent Sold
         Defendant's Sham Transaction……………………………….........     8

     C.  Substance Over Form: Sham Transaction Targeted US
         Taxpayers and Was Manufactured in Europe………………........     10

     D.  Defendant's Agent's $875,000 Sale to a Reasonable and Prudent
         Person Required Defendant to Have a Leading Role.....................     10

     E.  Several Bases for Agency Are Argued…………………….........     13

         1.  Marketing process shows a lack of legal separation………......     13

         2.  Mr. Mann, as a reasonable and prudent person, had
             reasons to believe that Thomas D. Seck had "apparent
             authority"…………........................................................     14

         3.  Agency by estoppel may be argued since Defendant
             never tried to notify Mr. Mann of the facts and he can
             prove both reliance and a change of position………………........     17

i

4.  Defendant is negligent in its handling of Thomas D. Seck and the marketing process…………………………………….…… 17

5.  Defendant ratified the unauthorized dealings of Thomas D. Seck……………………………………………………..... 18

F.  The Corporate Veil Should Be Pierced to Keep Defendant From Hiding Behind a Corporate Shield………................................ 19

1.  There are both nexus with North Carolina and the perpetration of fraud....................................................................... 19

2.  A lack of legal separation is shown by Defendant's actions……................................................................................ 21

3.  Documents are not representative of the actual events in the sham transaction.................................................................. 22

4.  Sales misrepresentations were made to make a sale and included fraud and wrongdoing…………………............... 22

5.  Defendant marketed a defective and dangerous instrumentality that a major law firm would not support…........... 23

6.  Features and provisions of the Creative Financial Solution could not withstand analysis, and sham economic substance is found.......................................................... 24

7.  Economic cost of the sham transaction is an enormous $1,786,869………………………………………………..... 27

8.  If fraud is involved, veil piercing is not required…………........... 28

G.  Injustice/Unfairness/Inequity Should be Avoided and Mr. Mann Should be Allowed his Day in Court………………............... 28

H.  Standard of Review............................................................................... 29

VI.  CONCLUSION…………………………………………………… 30

CERTIFICATE OF COMPLIANCE.................................................................... 31

CERTIFICATE OF SERVICE......................................................................... 32

# TABLE OF AUTHORITIES

<u>FEDERAL CASES</u>

*Bulova Watch Co. v. K. Hattori & Co.*,
    508 F.Supp. 1322 (E.D.N.Y. 1981) ………………………………… 21

*District 29, UMW v. United Mine Workers of Am. 1992 Benefit Plan*,
    179 F.3d 141 (4th Cir. 1999)………………………………………... 28

*Hoffman v. United Telecommunications, Inc.*,
    575 F.Supp. 1463 (D. Kan. 1983) ………....................................... 20

*Horn v. Commissioner*,
    968 F.2d 1229 (D.C. Cir. 1992)...………………………………… 24

*In Re Packer Avenue Associates*,
    1 Bankr.286 (Bankr. E.D. Pa. 1979),
    *aff'd.* 723 F. 2d 897 ………………………………………………. 18

*Metco Products, Inc., Div. of Case Mfg. Co. v. NLRB*,
    884 F.2d 156 (4th Cir. 1989)………………………………………… 16

*Welch v. Helvering*,
    290 US 111 (1933) ………………………………………………….. 24

<u>STATE CASES</u>

*Glenn v. Wagner*,
    329 S.E.2d 326 (N.C. 1985) ……………………………………….. 29

*McGee v. Breezy Point Estates*,
    166 N.W.2d 81 (Minn. 1969) ……………………………………… 16

*Southwestern Portland Cement v. Beavers*,
    478 P.2d 546 (N.M. 1970) ………………………………………… 15, 16

*Snipes v. Jackson*,
    316 S.E.2d 657 (N.C. App. 1984) ………………………………… 28

*Walker v. Pacific Mobile Homes, Inc.*,
    413 P.2d 3 (Wash. 1966) ……………………………………...    17

*Zimmerman v. Hogg & Allen*,
    209 S.E.2d 795 (N.C. 1974)……………………………………..    15

**Statutes and Rules**

Title 26 U.S.C. .....................................................................    *passim*

28 U.S.C. 1291…………………………………………………    1

Fed. R. Civ. P. 12(b)(2)……………………………………......    1

**Other Authorities**

Internal Revenue Service Form 886-A .........................................    *passim*

Internal Revenue Service Form 906..............................................    *passim*

Restatement, Second, Agency, § 8 (1958)....................................    14,17

Restatement, Second, Agency, §27 (1958)....................................    16

Restatement, Second, Agency, §82 (1958)....................................    18,19

Restatement, Second, Agency, §96 (1958)....................................    19

Black's Law Dictionary Legal Dictionary 10th Edition, p 775………………    6

## I.  STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION

Plaintiff Richard W. Mann filed this action alleging breach of contract, negligence, fraud, breach of fiduciary duty of good faith and fair dealing, breach of contract constituting professional malpractice, breach of warranty, and fraudulent inducement. The United States District Court for the Middle District of North Carolina exercised subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332.

The Court of Appeals for the Fourth Circuit has appellate jurisdiction pursuant to 28 U.S.C. § 1291, which grants appellate review of final decisions of district courts of the United States. Counsel certifies that the instant appeal arises from a final decision of the District Court. The District Court entered an Order and Judgment, dated May 6, 2014, for lack of personal jurisdiction under Fed. R. Civ. P. 12(b)(2). The Notice of Appeal was filed on May 23, 2014.

## II.  STATEMENT OF ISSUES

1.  Whether the District Court erred in dismissing the action for lack of personal jurisdiction because Thomas D. Seck lacked express authority to bind Defendant.

2.  Whether wrongdoing, injustice, or fraud are present.

3.  Whether the corporate veil must be pierced when wrongdoing, injustice, or fraud are present.

4. Whether the District Court erred in not finding that Defendant's corporate veil had been pierced.

## III. STATEMENT OF THE CASE AND FACTS

Judge Beaty of the U.S. District Court for the Middle District of North Carolina handed down an Order and Judgment on May 6, 2014 that dismissed Appellant's (Mr. Mann's) action pursuant to Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction. (JA 337 – 341). The Court of Appeals for the Fourth Circuit has appellate jurisdiction pursuant to 28 U.S.C. § 1291, which grants appellant review of final decisions of district courts of the United States. Mr. Mann seeks an appellate review of the basis for personal jurisdiction of the Appellee to pierce the corporate veil when a North Carolina agent with apparent authority marketed the product, and fraud and wrongdoing were involved. (JA 342).

The Internal Revenue Service (IRS) notified Appellant, Richard W. Mann, on or about 2005 that his 2002 Form 1040 Income Tax Return was under audit. Shortly thereafter, Mr. Mann received a questionnaire regarding items on the return. The IRS kept sending questionnaires and Information Document Requests (IDRs) every 4-6 months trying to piece the information together. The IRS was particularly interested in a $17.5 million capital loss on Mr. Mann's return. During the process of gathering information, Mr. Mann attended an interview where

2

specific questions were asked under penalties of perjury. The Office of Tax Shelter Analysis in Washington, D.C. formulated the questions and directed the Greensboro, North Carolina IRS personnel to administer them to Mr. Mann. Before the Greensboro, North Carolina IRS personnel met with Mr. Mann, the IRS issued a summons for production of all documents and information associated with the generation of the $17.5million capital loss. At this point in the investigation, approximately four years after it commenced, the IRS knew Mr. Mann had entered into a *Creative Financial Solution* (*aka* abusive tax shelter) provided by the Defendant for a fee of $875,000. (JA 303, 310 and 317) When the IRS disallowed this abusive tax shelter and the related $17.5 million capital loss in 2011, the IRS provided Mr. Mann with an IRS Form 886-A (Explanation of Items) to support its investigation and findings. (JA 299 – 324). The investigation (e.g., IDRs and interviews under penalty of perjury) choreographed by the IRS task force over several years produced confidential information that Mr. Mann did not know existed. The Form 886-A findings had been gathered over many years; yet, Mr. Mann was still impressed with the infinite detail. Ultimately, the IRS assessed $911,869 in tax penalties (IRS Form 906, JA 325 – 327) warranted by the severity of the so-called *Creative Financial Solution* described in the IRS Form 886-A (Explanation of Items). (JA 299 – 324)

## IV.  SUMMARY OF ARGUMENT

In 2002, Mr. Mann entered into the *Creative Financial Solution* that was provided by Defendant at a cost of $875,000.  On or about 2005, the IRS started an audit and investigation of items in Mr. Mann's 2002 Form 1040 income tax return. A $17.5 million capital loss was of particular interest to the IRS. After years of questionnaires, information document requests (IDRs), and interviews under penalty of perjury, the IRS issued Form 886-A, Explanation of Items (JA 299-324), explaining why the $17.5 million loss was disallowed, how the sham economic substance transaction was structured, Defendant's role in the design and structure of the tax shelter transaction, and the justification for assessment of penalties. Tax penalties were then assessed in the amount of $911,869. (JA 325 – 327). The IRS labeled Defendant a "tax promoter" in its report.

Contrary to the district court's assumptions, Defendant's agent, Thomas D. Seck, delivered marketing presentations to Mr. Mann in his office in North Carolina. The marketing materials distributed by Thomas D. Seck had the Defendant's name on them.

The district court held that Mr. Mann failed to establish personal jurisdiction in North Carolina and failed to pierce the corporate veil even though Thomas D. Seck resided in Charlotte, North Carolina, and focused on marketing for his employer, Pali Capital, Inc., which was a wholly owned affiliate of Defendant. (JA

4

307) Thomas D. Seck stressed to Mr. Mann that Defendant, a $3 billion bank, was there for support if a problem arose with the *Creative Financial Solution*. Mr. Mann did not find that Pali Capital had an impressive presence other than as a U.S. marketing apparatus for Defendant.  He argues that without the involvement of Defendant he, as a reasonable and prudent person, would not have paid the $875,000 and entered into the *Creative Financial Solution*. Thomas D. Seck was located in Charlotte, North Carolina and paid taxes and owned/leased property there and had full access to Defendant's marketing materials. (JA 167 – 192, 196 – 220). Defendant performed all the integral parts in Europe. Mr. Mann argues that Thomas D. Seck could bind Defendant through apparent authority, agency by estoppel, and ratification of unauthorized transactions. Defendant was always in total control of the transaction and never tried to correct an "unauthorized act".

Thomas D. Seck was located in North Carolina and funneled business offshore to Defendant in Europe. Mr. Mann has the enormous benefit of the IRS's findings developed from confidential information obtained from Pali Capital. The abusive tax shelter called the Rowan strategy never should have been marketed because it was a defective product. The original attorneys at Proskauer Rose declined to issue a favorable legal opinion for the abusive tax shelter. (JA 317). Defendant dominated Pali Capital, its U.S. affiliate, causing business to be transferred offshore. Defendant also purposefully availed itself of the forum by

using Thomas D. Seck to market its products. There was no legal separation between the affiliates, and Pali Capital was simply a substitute for doing business in the U.S.

Defendant's corporate veil should be pierced to prevent fraud or to achieve equity. "Fraud: A knowing misrepresentation or knowing concealment of a material fact made to induce another to act to his or her detriment." Black's Law Dictionary Legal Dictionary 10th Edition, p 775.

When the IRS analyzed the Rowan strategy, the abusive tax shelter, it uncovered multiple instances of fraud in the series of integrated, pre-arranged, and scripted steps. First, cashless, paper entry loans were used which were made with no financial information. Second, previously nonexistent Isle of Man entities were formed and capitalized with no collateral. The confidential Pali schematic diagram shows all the steps in Mr. Mann's abusive tax shelter. (JA 223 – 226, 321 – 324). One entity (Savile) existed only three days (JA 318) before generating a $17.5 million capital loss. (JA 309 – 310) Finally, there is no verifiable information that options trading occurred. (JA 312) Documents and the dates of execution were totally unreliable. Mr. Mann did not recognize much of the terminology in the documents that he signed. A Pali Capital representative admitted that meetings referenced in documents never occurred. (JA 313) An IRS agent told Mr. Mann that he would always remember his transaction because it was a charade—i.e.,

smoke and mirrors. The prevalence of fraud perpetrated (both actual and constructive) against Mr. Mann suggests that it is not necessary to pierce the corporate veil to find personal jurisdiction of Defendant.

The lengthy IRS investigation has caused the statute of limitations in all forums to run except for North Carolina. North Carolina law provides for the statute to start to run from the point of assessment, 2011.  Mr. Mann seeks his only chance of his day in court in North Carolina. The IRS tax penalties assessed, $911,869 (JA 325 – 327), are more than the fee, $875,000 (JA 303, 310, 317), charged to enter into the *Creative Financial Solution*.  Mr. Mann asks for fairness, equity, and justice. The IRS findings should be found credible, and the veracity of the IRS should not be questioned.

## V.  ARGUMENT

### A.  IRS Enforcement Authority Has Statutory Basis.

The IRS is responsible for enforcing the Internal Revenue Code (U.S.C.A. title 26), which codifies all U.S. tax laws. Historically, Congress has given the IRS unique and wide-ranging powers for administering the U.S. tax system and enforcing its laws. For example, the IRS has the authority under Title 26 U.S.C. to interview taxpayers, examine books and witnesses, serve and enforce summons, administer oaths and certify, arrest, and refer criminal activity to the Department of Justice.

**B. IRS Findings Show Defendant's Agent Sold Defendant's Sham Transaction**

IRS Form 886-A presented to Mr. Mann showed key findings from the audit and Investigation, including testimony of Paul Frelich, Managing Director of Pali Capital:

> In 2002, Richard Mann engaged in an abusive tax shelter transaction designed and promoted by European American Bank (Euram Bank) and its affiliate Pali Capital Inc. (Pali), which was known as the "Euram Rowan strategy." The strategy, which involves a series of integrated, pre-arranged, and scripted steps was designed to provide a taxpayer who had significant ordinary or capital gain with a non-economic ordinary or capital loss. If necessary, the loss could be generated within a matter of weeks. (Form 886-A, p. 1) (JA 300).

> Fee amount paid by Mr. Mann approximates $875,000—i.e., $874,980. (IRS Form 886-A p 8, p 22, and p 46) (JA 303, 310, 317).

> Isle of Man entities used in the abusive tax shelter transaction (Medstone and Hollowsmill) had no assets when they were formed and did not engage in any activity other than the transaction. (IRS Form 886-A, p 7) (JA 302).

> Loans made to Medstone and Hollowsmill were cashless paper entries with no apparent profit associated with these loans. (IRS Form 886-A, pp 7,8) (JA 302,303).

> Mr. Mann, Medstone and Hollowsmill (entities used in the tax shelter) did not provide any financial information to obtain loans totaling $24 million. (IRS Form 886-A, p 33, 50) (JA 312, 320).

> Pali Capital, Inc. was acquired in 2001 and divested in 2007. (JA 307).

8

The $7 million loan to Mr. Mann where the funds never left the bank, had no risk, no substance and was no more than a circular flow of debit and credit entries to create the illusion of a substance for basis and at risk purposes. (IRS Form 886-A, pp 48,49,50) (JA 318 – 320).

Pali Capital Inc. was acting as a conduit and agent of Defendant (IRS Form 886-A, p17) (JA 308).

Results of Euram Rowan Strategy were fixed, and Mr. Mann and Defendant could not lose in options trading. (IRS Form 886-A, pp 28, 34, 45) (JA 311, 313, 316).

Contrary to marketing presentation details, Mr. Mann had no economic profit potential from the option trades (IRS Form 886-A, pp 21, 41, 45) (JA 309, 315, 317).

There is no objectively verifiable evidence that the (option) transactions took place. (IRS Form 886-A, p 33) (JA 312).

Mr. Mann signed documents drafted by Euram that he did not understand and signature dates were misleading.  (IRS Form 886-A, p 17, 34) (JA 308, 313).

Rowan Strategy was a sham economic substance transaction. (IRS Form 886-A, pp 46,48) (JA 317-318).

Confidential Pali schematic diagram (CONFIDENTIAL PALI004025) shows that Defendant is the foundation for all activities. (Referenced on IRS Form 886-A, p 2) (See diagram at JA 223-226, 321-324).

Parties do not appear to have respected the terms of the transaction. (IRS Form 886-A, p 33) (JA 312).

Savile had assets for no more than three days (IRS Form 886-A, p 48) (JA 318) and generated a $17.5million capital loss. (IRS Form 886-A, pp 21-22) (JA 309-310).

### C. Substance Over Form: Sham Transaction Targeted US Taxpayers and Was Manufactured in Europe

The *Creative Financial Solution* targeted the United States Internal Revenue Code 26 U.S.C. § 1221. ***Only U.S. taxpayers*** could use the capital losses generated by the *Creative Financial Solution*. However, Defendant was located in Vienna, Austria and provided the critical ingredients (the integral parts) of the tax shelter in Europe: funding and capitalization of previously nonexistent Isle of Man entities (Medstone and Hollowsmill), loans (JA 305) and options trading (JA 312) in Europe. All of the shelter's processes had the appearance (window-dressing) of normal business transactions, but when the Internal Revenue Service pulled back the curtain, it found a sham (illegal transaction).

Mr. Mann argues Defendant needed an agent in the U.S. to market its U.S. abusive tax shelter strategy. Thus, the sham was manufactured in Europe, but it was sold in the U.S. for the use of U.S. taxpayers. The huge profit potential of *Creative Financial Solutions* provided the Defendant with an ulterior motive to do nonprofitable business (i.e., make loans that do not yield a profit, JA 302-303,305).

### D. Defendant's Agent's $875,000 Sale to a Reasonable and Prudent Person Required Defendant to Have a Leading Role

Mr. Mann considers himself a "reasonable and prudent person." Putting this in the proper context, Mr. Mann would not pay $875,000 for a *Creative Financial Solution* without finding an adequately capitalized entity to participate and support

10

the transaction in good times and in bad times. Mr. Mann had no knowledge of Pali

Capital or Euram Bank before Thomas D. Seck, National Director, Client Services,

Pali Capital, Inc. (as shown on his business cards on JA 166,193,195) contacted

him. During the sales meetings, Mr. Mann felt that Pali Capital was

undercapitalized for the long term. In order for Thomas D. Seck to sell the product

and get Mr. Mann to part with his $875,000, he assured Mr. Mann that Euram

Bank, a $3 billion bank affiliated with Pali Capital, was the creator of the *Creative*

*Financial Solution*, controlled the steps in the process, and thus, could be counted

on in the long term. Mr. Mann argues that he did not know the process and acted in

good faith after Seck assured him that Euram Bank would be there for support if

needed. He had no idea that Isle of Man entities would be involved with shady tax

abuse reputations and referenced in the "Senate Subcommittee Report dated

August 1, 2006 on Tax Haven Abuses: The Enablers, The Tools, and Secrecy". (JA

304) In his very successful insurance business career, Mr. Mann has enjoyed

fruitful relationships with banks and found them to be good business partners—

able to trust their due diligence procedures—during his many years of experience

in dealing with them. Thomas D. Seck visited Mr. Mann three to four times at his

North Carolina office and each time left business cards (eight cards in total) (JA

166,193,195), marketing literature (two presentation materials each) for the (1)

Oak Strategy  (JA 196-220) and (2) Birch Strategy (JA 167-192); *Creative*

*Financial Solutions* brochures (eight brochures in total); Single Manager Hedge Funds brochure; Euram Bank AG executive officers with the bank's business specialities (glossy pages); and Alternative Investment Management (CD presentation).  To add emphasis to his presentations and show the strength of its *Creative Financial Solutions*, Thomas D. Seck said that Euram Bank AG (a $3 billion bank) was there to support them. Thomas D. Seck traveled from his Charlotte, North Carolina office to meet with Mr. Mann. Seck had full access to Defendant's marketing materials. A Charlotte location is shown on a Euram Group map included with the Oak Strategy marketing materials. The page-wise progression of the various steps in the deliverables for the Birch and Oak *Creative Financial Solutions* (abusive tax shelters) show Defendant as the key provider of the integral parts. (JA 196 – 220,167 – 192) Thomas D. Seck owned/rented property and paid taxes in North Carolina. During the marketing process of selling the Rowan Strategy to Mr. Mann, Thomas D. Seck suggested to Mr. Mann that he could increase the $10.5 million capital loss to $17.5 million by obtaining a $7 million loan from Defendant. Immediately thereafter, Mr. Mann was contacted by Defendant to arrange the $7 million loan. When Thomas D. Seck visited Mr. Mann, who was a sophisticated or accredited investor, the discussion was not about the value of a relationship with Pali Capital (his employer), but the focus was on the strength of the foreign affiliate, Euram Bank (Defendant). The marketing

approach may have considered Pali Capital's size and capital so insignificant that an accredited investor would not be impressed and be interested in doing business with them.

### E. Several Bases for Agency are Argued

1.  Marketing process shows a lack of legal separation.

Thus, Mr. Mann argues that there was no legal separation between the affiliates' actions in North Carolina. Pali Capital's marketing was a platform or portal to send business to Defendant, and the affiliate corporation (Euram Bank) purposefully availed itself of the particular forum for exercising jurisdiction. Euram Bank acquired Pali Capital in 2001 and divested it in 2007 according to IRS Form 886-A, p 13. (JA 307) Mr. Mann argues that the marketing presentations focused on Defendant and Defendant's *Creative Financial Solutions*.  (Business Card with Pali Capital, Inc in small print). (JA 166,193,195) Secrecy was pervasive in the *Creative Financial Solution*.  The IRS further stated:

> Moreover, there is no objectively verifiable evidence that the option transactions (JA 129-163) ever took place. The trades were not entered into on any regulated market and there were no settlement agent or other third party to verify that the trades occurred. There is no evidence relating to how the premiums were determined or if they reflected a market price. Other than Mr. Mann's participation, the trades were purportedly engaged in by the promoter, Euram Bank in Vienna, and the Isle of Man entities, Medstone and Hollowsmill, a closed circle of closely associated entities which appear to have all received fees for their roles in the transaction. The funds purportedly used to pay premiums on the trades never left Euram Bank. All of the

premiums paid by Heddon and $7 million of the funds paid by
Mr. Mann were funds provided by Euram Bank. Moreover, these
entities and their personnel were located offshore, and in
particular, in jurisdictions with bank secrecy laws. Consequently,
documents and testimony relating to these transactions were
inaccessible to examining agents." (IRS Form 886-A, p 33) (JA
312).

The confidential Pali schematic diagram referenced at the bottom of IRS Form

886-A, p 2 (JA 301) lists and shows all steps in Mr. Mann's abusive tax shelter

with Defendant (Euram Bank) being the foundation for all things attempted. (JA

223, 321).

2.  Mr. Mann, as a reasonable and prudent person, had reasons to believe
    that Thomas D. Seck had "apparent authority."

Apparent authority involves a principal's liability for its agent's conduct

arising from manifestations that the principal makes to a third party, not to the

agent. *See* Restatement, Second, Agency § 8 (1957). The elements of apparent

authority are (1) manifestations by the principal to the third party (whether directly

or indirectly) that (2) are the source of (3) the third party's actual and (4)

reasonable belief that the agent has authority to act. Restatement, Second, Agency

§ 8 (1957).

Mr. Mann argues that Thomas D. Seck, as an employee of Pali Capital Inc.

(wholly owned affiliate of Defendant) and located in North Carolina, binds the

principal (Defendant) as its agent. Mr. Mann vehemently argues that he would not

have paid $875,000 for a *Creative Financial Solution* without the backing and

14

participation of the well-financed entity, Euram Bank. Mr. Mann also argues as a "prudent and reasonable" person that he had no reason to believe that Thomas D. Seck was acting outside the scope of his authority. At the first meeting, Thomas D. Seck delivered Defendant's sales brochures, discussed Defendant's strengths, involvement, and support, and had Defendant contact Mr. Mann to arrange a $7 million "nontraditional loan" without having to submit any credit information before entering into the Rowan Strategy. Defendant's conduct/manifestation toward Mr. Mann in granting the "nontraditional loan" caused Mr. Mann to reasonably believe that Thomas D. Seck had authority to act. During additional sales meetings or visits, Thomas D. Seck provided literature regarding additional *Creative Financial Solutions* that showed Euram Bank as their integral participant. See "Birch Strategy" at JA 167-192, and "Oak Strategy" at JA 196-220. Thomas D. Seck had full access to Defendant's marketing materials.

> When a corporate agent acts within the scope of his apparent authority, and the third party has no notice of the limitation on such authority, the corporation will be bound by the acts of the agent . . . . *Zimmerman v. Hogg & Allen*, 209 S.E. 2d 795, 799 (N.C. 1974). The determination of a principal's liability in any case must be determined by what authority the third person in the exercise of reasonable care was justified in believing that the principal had, under the circumstances, conferred upon his agent. *Id*.

In *Southwestern Portland Cement v. Beavers*, the Court said:

> A settled course of conduct does serve to create apparent authority in the agent binding upon the principal where the acts

are not timely disavowed and a third party is thereby induced to rely on the ostensible authority of the agent and does so in good faith and with reasonable prudence. The doctrine is based on an estoppel: the principal will not be permitted to establish that the agent's authority was less than what was apparent from the course of dealing for when one of two innocent parties must suffer, the loss must fall upon the party who created the enabling circumstances . . . .  478 P.2d 546, 549 (N.M. 1970).

In *McGee v. Breezy Point Estates*, the Minnesota Supreme Court said:

An agent's apparent authority results from statements, conduct, lack of ordinary care, or other manifestations of the principal's consent, whereby third persons are justified in believing that the agent is acting within his authority. Therefore, the scope of apparent authority is determined not only by what the principal knows and acquiesces in, but also by what the principal should, in the exercise of ordinary care and prudence, know his agent is doing." Thus, if a principal acts or conducts his business either intentionally or through negligence, or fails to disapprove of the agent's acts or course of action so as to lead the public to believe that his agent possesses authority to act or contract in the name of the principal, the principal is bound by the acts of the agent within the scope of his apparent authority as to persons who have reasonable grounds to believe that the agent has such authority and in good faith deal with him . . . . 166 N.W.2d 81, 89 (Minn. 1969).

 [A]pparent authority to do an act is created as to a third person by written or spoken words or any other conduct of the principal which, reasonably interpreted, causes the third person to believe that the principal consents to have the act done on his behalf by the person purporting to act for him. Restatement, Second, Agency § 27; *Metco Products, Inc., Div. of Case Mfg. Co. v. NLRB*, 884 F.2d 156, 159 (4th Cir. 1989).

Apparent authority is the power to affect the legal relations of another person by transactions with third persons, professedly as agent for the other, arising from and in accordance with the

16

other's manifestations to such third persons. Restatement, Second, Agency § 8.

3. <u>Agency by estoppel may be argued since Defendant never tried to notify Mr. Mann of the facts and he can prove both reliance and change of position.</u>

Agency by estoppel differs from apparent authority:

(1) A person who is not otherwise liable as a party to a transaction purported to be done on his account, is nevertheless subject to liability to persons who have changed their positions because of their belief that the transaction was entered into by or for him, if (a) he intentionally or carelessly caused such belief, or (b) knowing of such belief and that others might change their positions because of it, he did not take reasonable steps to notify them of the facts. Restatement, Second, Agency § 8B.

Mr. Mann argues that he can prove both (1) reliance and (2) change of position resulting in loss.

4. <u>Defendant is negligent in its handling of Thomas D. Seck and the marketing process.</u>

How could Defendant allow Thomas D. Seck to create and distribute marketing materials with Defendant's name on them without being negligent and creating a binding contract with the Defendant?

To constitute a manifestation of an agent's apparent authority by the principal, the circumstances must be such that a prudent person would have believed that the agent possessed the authority to do the particular act in question. *Walker v. Pacific Mobile Homes, Inc.,* 413 P.2d 3 (Wash. 1966)

17

Defendant was always in control of the transaction and never tried to correct an

"unauthorized act." Defendant could have nullified the transaction *ab initio*.

5.  <u>Defendant ratified the unauthorized dealings of Thomas D. Seck.</u>

> Ratification is the affirmance by a person of a prior act which did
> not bind him but which was done or professedly done on his
> account, whereby the act, as to some or all persons, is given
> effect as if originally authorized by him. Restatement, Second,
> Agency § 82.

The bankruptcy court in *In Re Packer Avenue Associates* explained

ratification:

> Ratification results when a principal affirms a previous
> unauthorized act by his agent. The effect of ratification is to give
> the principal's agent the authority to perform the unauthorized
> act as of the time the agent performed the unauthorized act . . . .
> In essence, ratification by a principal of his agent's unauthorized
> act is equivalent to the agent having that particular authority
> from the beginning. The affirmance by the principal of his
> agent's act may be express or implied from the conduct of the
> principal . . . . Affirmance of an unauthorized transaction by the
> agent may also be inferred from the principal's failure to
> repudiate it once it comes to his knowledge . . . . Additionally, it
> is clear that a principal cannot repudiate the unauthorized
> conduct of his agent while at the same time retaining the benefits
> of his agent's unauthorized act. Indeed, the acceptance of the
> benefits of the unauthorized acts of an agent by his principal
> confirms the authority of the agent to perform the unauthorized
> act and estops the principal from denying liability for the
> attendant obligations arising thereunder . . . . *In Re Packer
> Avenue Associates*, 1 Bankr. 286 (Bankr. E.D. Pa. 1979). 49
> (1970).

Mr. Mann makes the further argument that Defendant ratified the agreement by receiving its benefits and failing to repudiate it. See Restatement, Second, Agency § 82 (1958).

> If a principal ratifies part of a transaction, he is deemed to ratify the whole of it . . . Restatement, Second, Agency § 96.

Mr. Mann argues that the transaction was controlled by the Defendant who was aware of every step in the process (a series of integrated, pre-arranged, and scripted steps). (IRS Form 886-A, p 1) (JA 300).

## F.  The Corporate Veil Should Be Pierced to Keep Defendant From Hiding Behind A Corporate Shield

### 1.  There are both nexus with North Carolina and the perpetration of fraud.

Mr. Mann argues that sufficient grounds exist to pierce the corporate veil for jurisdictional purposes. He asks the court to assert personal jurisdiction over an alien affiliate in this litigation arising out of the actions of its affiliate's employee, Thomas D. Seck. Thomas D. Seck was the gatekeeper for business being funneled offshore to the Defendant. For example, Defendant's $7 million "nontraditional cashless loan" to Mr. Mann was the proximate cause for the payment of $350,000 in fees (5% x $7 million) out of a total amount of $875,000 (5% x $17.5 million) in fees.  Defendant caused Pali Capital to gain business for them and transfer that business to the Defendant. Mr. Mann alleges a sufficient nexus between the domination and control of Pali Capital by Defendant and the fraud perpetrated by

19

Defendant on Mr. Mann. North Carolina courts will allow the corporate veil to be pierced "whenever necessary to prevent fraud or to achieve equity." *Glenn v. Wagner*, 313 N.C. 450, 329 S.E.2d 326, 330 (1985). Defendant was the promoter of this sham: "Since all of the monetary transfers were between Euram itself and accounts held at Euram, the circular flow of money could be accomplished through nothing more than account entries. No actual funds needed to be transferred except for taxpayer's initial investment . . . ." (IRS Form 886-A, p 46) (JA 317).

In *Hoffman v. United Telecomms.*, an articulation of a jurisdictional veil-piercing test is set forth. *Hoffman v. United Telecomms.*, 575 F. Supp. 1463 (D. Kan. 1983). The district court in Kansas laid out a typical three-factor test:

> First, the court must search for factors which establish whether or not any relationship exists between the affiliated corporate parties. Second, the court must search for factors which establish direction or control from the forum, and, third, the court must look for factors which establish a flow of benefits or funds to and from the forum such that the defendant may be said to have purposefully availed itself of the benefits and protections of the forum. *Id*. at 1472.

Mr. Mann respectfully asks the Court to review the findings of the IRS in its exhaustive study to find a lack of separation between the affiliates' (Pali Capital's and Defendant's) actions in the forum, and thus, pierce the corporate veil and impute jurisdiction over the affiliate. This justifies treating the foreign affiliate and U.S. affiliate as one entity for the purpose of asserting jurisdiction.

2.  <u>A lack of legal separation is shown by Defendant's actions</u>.

Mr. Mann argues that the District Court overlooked employing a "substitute for doing business" standard to analyze the relationship between the alien affiliate and U.S. affiliate. *Bulova Watch Co. v. K. Hattori & Co*., 508 F.Supp. 1322, 1344-45 (E.D.N.Y. 1981). He points to the degree of economic integration between the alien affiliate and U.S. affiliate that shows that the presence of the U.S. affiliate is a mere formality and is serving as the foreign affiliate's "substitute for doing business" in the United States. The lack of corporate separation and the realities of day-to-day control by the foreign affiliate (with its vast $3 billion of economic resources) in the process of the *Creative Financial Solution* shows arguably that the U.S. affiliate is operating as a substitute for the alien affiliate's direct doing business in the United States. The existence of the subsidiary (Pali Capital) is a pretense and a mere conduit for the alien affiliate (Defendant). Pali Capital was thinly capitalized and could not do adequate marketing to reasonable, prudent persons without the assurance that a $3 billion bank that could stand the "test of time" was there for support. All the critical steps in the *Creative Financial Solution* entered into by Mr. Mann were conducted offshore (outside the U.S.) by the Defendant—i.e., formation and funding of previously nonexistent Isle of Man entities," bogus loans" to all parties, and purported "options trading" (integral parts).  (JA 223 – 226, 321 – 324 for Pali diagram).

3.  Documents are not representative of the actual events in the sham transaction.

The IRS found that the documents were not indicative of real world events and dates:

> It is apparent that Mr. Mann did not author many, if any, of the documents that bear his signature. The transactional documents were drafted by Euram, apparently in an attempt to imbue the transaction with economic substance. It is clear from the testimony of Mr. Mann and Mr. Frelich, however, that neither the meeting nor the conversation referenced in the "Investment Advisory Mandate" letter dated "30 November 2002" nor the "request for indicative pricing" letter dated "16 December 2002" occurred, nor did Mr. Mann even use or understand some of the terminology in the letters. Dates are unreliable as Mr. Mann did not pay attention to dates when signing documents, and some documents, such as the "Subscription Agreement" for Savile and the Savile trade confirmations clearly were executed months after the dates on the face of the document.

> In sum, Mr. Mann has not shown that the transaction for which he claimed a $17.5 million short term capital loss ever occurred in fact or was more than a mere paper transaction created by Euram and other facilitators to create the illusion of an actual trade to support a tax loss for Mr. Mann. (IRS Form 886-A, p 34) (JA 313).

4.  Sales misrepresentations were made to make a sale and included fraud and wrongdoing.

Thomas D. Seck, a marketing representative from Pali Capital, contacted Mr. Mann to acquaint him with Pali Capital and its affiliate, European American Investment Bank AG (Euram). Mr. Mann then learned more about the *Creative Financial Solution* offered by Defendant in a marketing presentation. Based on his

conversation with Thomas D. Seck, Mann says that he understood that the *Creative Financial Solution* provided an opportunity for both pre- and post-tax profit. Although he did not understand or appreciate all the details of the strategy, Thomas D. Seck explained that there was an opportunity to double his investment, but with limited downside risk by reason of the call option which he would acquire as a hedge against the risk of loss on one side of the strategy." . . . "The circularity of the cash flow gives no profit potential to Mr. Mann and assures that Euram will be made whole." (IRS Form 886-A, p 45) (JA 316). "Consequently, there was no profit potential in this transaction." (IRS Form 886-A, p 41, 45) (JA 315 – 316) Clearly, fraud was perpetrated on Mr. Mann. Mr. Mann alleges from his meetings with Thomas D. Seck, he was told that Defendant was skilled in *Creative Financial Solutions*, that the strategy was lawful, and that a $3 billion bank (Defendant) was there to support its product. But before Mr. Mann paid the $875,000 fee, he was again reassured that Defendant was there in case of trouble.

5. <u>Defendant marketed a defective and dangerous instrumentality that a major law firm would not support.</u>

Mr. Mann argues that the *Creative Financial Solution* involved too much risk at the time that it was sold and should never have been marketed to him (constructive fraud). The IRS found in their investigation that Pali/Euram knew or should have known that it was a listed transaction that the IRS would not accept.

> [T]he Rowan strategy is substantially similar to notices that
> were outstanding at the time Mr. Mann engaged in the
> transaction. Pali's customary outside legal counsel, Proskauer
> Rose LLP, spent a number of months working with Pali on the
> design of the Rowan strategy but then decided that it would not
> be willing to provide favorable tax opinions for Pali's clients for
> the strategy. (IRS Form 886-A, p 46) (JA 317).

The alternative law firm, Seyfarth Shaw, showed Euram Bank as the provider. (JA

232). Mr. Mann was never informed of the high degree of risk.

6.  <u>Features and provisions of the *Creative Financial Solution* could not
    withstand analysis and sham economic substance is found.</u>

The IRS investigation tore through the form to look at the substance of the

*Creative Financial Solution* and found a sham as reported in IRS Form 886-A:

> A threshold question in any analysis is whether the transaction
> itself did in fact actually occur. The analysis must be done,
> before a court can determine whether the transaction's primary
> objective was for the production of income or to make a profit,
> or whether the transaction has economic substance. A factual
> sham is a transaction that did not occur, did not occur as reported
> or was performed in violation of some of the background
> assumptions of commercial dealing . . . *Horn v. Commissioner*,
> 968 F.2d 1229, 1236 (D.C. Cir. 1992). The taxpayers bear the
> burden of proving that the transactions actually occurred as
> claimed. *Welch v. Helvering*, 290 US 111, 115 (1933).

> The taxpayers have failed to establish that there was any actual
> trade, that the trade occurred as reported, or that it was not
> performed in violation of some of the background assumptions
> of commercial lending. Mr. Mann had no knowledge that he
> engaged in an S&P Index Option and testified that he had no role
> in structuring or monitoring the transaction. Based on his
> testimony and the "investment advisory mandate" letter signed
> by him dated "30 November 2002," Mr. Mann intended to
> participate in, if anything, a foreign currency trade. Further,

based on e-mails produced by Pali, Mr. Mann never even signed the confirmations for the purported trades until the middle of 2003, and did not actually execute the subscription agreement to acquire the Savile membership interest until July, 2003. Based on his testimony, it does not appear that Mr. Mann can confirm that the trades actually took place or verify the terms of the trade.

Moreover, there is no objectively verifiable evidence that these transactions ever took place. The trades were not entered into on any regulated market and there were no settlement agent or other third party to verify that the trades occurred. There is no evidence relating to how the premiums were determined or if they reflected a market price. Other than Mr. Mann's participation, the trades were purportedly engaged in by the promoter, Euram Bank in Vienna, and the Isle of Man entities Medstone and Hollowsmill, a closed circle of closely associated entities which appear to have all received fees for their roles in the transaction. The funds purportedly used to pay premiums on the trades never left Euram Bank. All of the premiums paid by Heddon and $7 million of the funds paid by Mr. Mann were funds provided by Euram Bank. Moreover, these entities and their personnel were located offshore, and in particular, in jurisdictions with bank secrecy laws. Consequently, documents and testimony relating to these transactions were inaccessible to examining agents.

In addition, the parties do not appear to have respected the terms of the transaction as reflected in the documents. For example, although Heddon apparently owed a fee to Pali under the terms of the Pali/Heddon Trading Advisory Agreement for 2002, there was no evidence that the fee was ever paid. There is no evidence that Medstone and Hollowsmill paid their .25% facility fees on their loans. Moreover, certain terms of agreements, or the sequence of events, appear to violate assumptions of commercial dealing. For example, Euram Bank agreed to loan Hollowsmill $350,000 at LIBOR as reflected in its Loan Agreement but also agreed to pay LIBOR on the deposit account Hollowsmill was required to maintain as collateral for the loan and which Hollowsmill was permitted to use to repay the loan. In addition, neither Mr. Mann nor the Isle of Man entities were apparently

required to furnish any financial information in support of their loan applications, in spite of loans totaling more than $24 million. Mr. Mann entered into an Investment Advisory Mandate with Pali for Savile dated 30 November 2002 even though he did not actually subscribe to the shares of Savile until July, 2003. The Subscription Agreement is made "as of December 18, 2002," the same date as the trade date reflected on the Savile confirmation.

Moreover, it is illogical to believe that Euram Bank would expose itself to downside on a $17.5 million bet with no upside, unless the outcome was predetermined. In addition, the December 19, 2002 "Cash Flow" forecast from Euram's Rajan Puri to Ray Knight reflects Mr. Mann's loss and the timetable of the purchase by Mr. Mann of Medstone's interest in Heddon—before the December 20, 2002 barrier observation date occurred that would purportedly determine which trades kicked out and which kicked in. Finally, contrary to what one would expect if Mr. Mann were trying to make a profit, Mr. Puri wrote to Mr. Mann by letter dated January 9, 2003, i.e., after Savile's options expired worthless, that "I trust that Ray informed you that we were successful with the trading options strategy."

It is apparent that Mr. Mann did not author many, if any, of the documents that bear his signature. The transactional documents were drafted by Euram, apparently in an attempt to imbue the transaction with economic substance. It is clear from the testimony of Mr. Mann and Mr. Frelich, however, that neither the meeting nor the conversation referenced in the "Investment Advisory Mandate" letter dated "30 November 2002" nor the "request for indicative pricing" dated "16 December 2002" occurred, nor did Mr. Mann even use or understand some of the terminology in the letters. Dates are unreliable as Mr. Mann did not pay attention to dates when signing documents, and some documents, such as the "Subscription Agreement" for Savile and the Savile trade confirmations clearly were executed months after the dates on the face of the document.

26

In sum, Mr. Mann has not shown that the transaction for which he claimed a $17.5 million short term capital loss ever occurred in fact or was more than a mere paper transaction created by Euram and other facilitators to create the illusion of an actual trade to support a tax loss for Mr. Mann.  IRS Form 886-A, pp 33 – 34 (JA 312 – 313).

7.   Economic cost of the sham transaction is an enormous $1,786,869.

After the IRS investigated the *Creative Financial Solution* and found it was a sham and assessed $911,869 in penalties, Mr. Mann approached Defendant to recover his fee. Mr. Mann argues that Pali Capital was acquired as a marketing apparatus to market Defendant's *Creative Financial Solutions* and funnel the work to Defendant in Europe. Mr. Mann argues that these "bait and switch tactics" were critical in recruiting him and that a fraud was perpetrated on him. Mr. Mann argues that he was not told that the *Creative Financial Solution* was illegal. Defendant was responsible for loans, funding the previously nonexistent Isle of Man entities with capital through loans, and options trading—all the essential parts of the *Creative Financial Solution*. The IRS found that the *Creative Financial Solution* had no substance and was an economic sham. (IRS Form 886-A, pp 34, 48 and 50) (JA 313, 318, 320). The $911,869 tax penalties assessed (JA 325-327) were more than the $875,000 fee to enter into the illegal *Creative Financial Solution*.

8.  If fraud is involved, veil piercing is not required.

If fraud is found, must there be a veil piercing of Defendant's (Euram Bank's) corporate veil? Citing a Fourth Circuit decision, Mr. Mann argues that a veil piercing may not be necessary:

> Despite its finding of fraud, however, the district court held that it could not find Patsy liable for benefits under the Coal Act unless it pierced Patsy's corporate veil. We disagree. The question is not one of veil piercing. Rather, it is whether Patsy's constructively-held assets generated revenue from any business activity as of and after February 1, 1993. It is apparent from the record that they did; indeed, these transferred assets generated revenue some time after that date. *District 29, UMW v. United Mine Workers of Am. 1992 Benefit Plan*, 179 F.3d 141, 145.

## G.  Injustice/ Unfairness/Inequity Should be Avoided and Mr. Mann Should be Allowed his Day in Court

Mr. Mann entered into the *Creative Financial Solution* at a cost of $1,786,869 ($875,000 fee plus tax penalties of $911,869) without receiving any economic benefit. The IRS took years to ascertain the facts, issue their findings and disallow the $17,500,000 capital loss. The forum in North Carolina presents the only forum in the world for Mr. Mann to have his day in court because the statute of limitations has not run in North Carolina.  In North Carolina, the statute of limitations does not start to run until the tax deficiency is assessed. *Snipes v. Jackson*, 316 S.E.2d 657 (N.C. App. 1984). Justice will not be served if Mr. Mann's case is dismissed for lack of personal jurisdiction.  Defendant will be unjustly enriched if it does not have to answer for its actions in North Carolina. In

28

addition, the State of North Carolina has an interest in protecting its citizens from vendors of any sham transactions. Mr. Mann argues that Pali Capital was merely acting as a marketing agent and instrumentality for Defendant:

> It should be remembered that the theory of liability under the instrumentality rule is an equitable doctrine. Its purpose is to place the burden of the loss upon the party who should be responsible. Focus is on reality, not form, upon the operation of the corporation, and upon the defendant's relationship to that operation. It is not the presence or absence of any particular factor that is determinative. Rather, it is a combination of factors which, when taken together with an element of injustice or abuse of corporate privilege suggest that the corporate entity attacked had "no separate mind, will or existence of its own" and was therefore the "mere instrumentality or tool" of the dominant corporation. . . . we simply note that our rule with regard to piercing the corporate veil is broad enough to encompass both those situations where there is a direct stock ownership of a subsidiary corporation by a parent corporation, and stock control as exercised through a mutual shareholder as evidenced in the present case. *Glenn v. Wagner*, 329 S.E.2d 326, 332 (N.C. 1985).

Thus, it applies to a parent-subsidiary relationship as well as a wholly owned affiliate relationship.

## H.  Standard of Review

Appellant asks the Court to consider definitions of real life events for parties who have ulterior motives outside the assumptions of commercial business dealing transactions. A party who can control all the non-arm's-length events can "stage" events to construct a prescribed view to the outside world. Cashless, paper entry (JA 318-320), no profit (302-303), no financial information (JA 312, 320) loans,

entities with no real-world business purpose (JA 309-310), options trading that cannot be verified, and supported with documents that are not representative (JA 308, 313), fit within these non-traditional definitions. It forces the legal mind to restart with a new inventory of definitions to uncover what really happened. Appellant respectfully asks for a de novo standard of review.

## VI.    CONCLUSION

Based on the foregoing, the District Court erred in granting Defendant's motion to dismiss for lack of personal jurisdiction. The Appellant, Richard W. Mann, respectfully asks the distinguished panel of judges to find personal jurisdiction of the Appellee, and send the case back to the U.S. District Court for the Middle District of North Carolina to allow Appellant to have his day in court.

This the 7th day of July, 2014.     By:   /s/Raymond A. Knight
                                           Raymond A. Knight
                                           NC Bar #9907
                                           3124 Allerton Lake Drive
                                           Winston Salem, NC 27106
                                           (336) 546-7067
                                           rayaknight@aol.com

## CERTIFICATE OF COMPLIANCE

This brief complies with the type/volume limitations of Fed. R. App. P. 329(a). Exclusive of the portions exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii), this brief contains 7,975 words. This certificate was prepared in reliance on the word-count function of Microsoft® Word for Mac 2011. The undersigned further certifies that this brief complies with the typeface and type-style requirements under Federal Rule of Appellate Procedure 30(a)(5) because it has been prepared in a proportionally spaced typeface using a 14-point Times New Roman font.

/s/ Raymond A. Knight
Raymond A. Knight

## CERTIFICATE OF SERVICE

I hereby certify that on this 7th day of July, 2014, I electronically filed and/or mailed the foregoing **Opening Brief of Richard W. Mann, Appellant,** using the Court's ECF system, which automatically sends an electronic notification to the following counsel of record, who are ECF participants:

Antonio E. Lewis, Esq.
Lead Attorney for Appellee
KING & SPAULDING LLP
100 North Tryon Street
Suite 3900
Charlotte, NC 28202
alewis@kslaw.com

Timothy G. Barber
tbarber@kslaw.com
KING & SPAULDING LLP
100 North Tryon Street
Suite 3900
Charlotte, North Carolina 28202
Attorney for Appellee

This the 7th day of July 2014.

 /s/ Raymond A. Knight
Raymond A. Knight (NC #9907)
**Attorney for Appellant**
3124 Allerton Lake Drive
Winston Salem, NC 27106
336-546-7067
rayaknight@aol.com